IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

KATRINNA S., [1]            )
      Plaintiff,            )            Civil Action No. 5:21-cv-00034
               )
v.            )            REPORT & RECOMMENDATION
               )
KILOLO KIJIKAZI,            )            By:   Joel C. Hoppe
Acting Commissioner of Social Security,            )                  United States Magistrate Judge
      Defendant.            )
               )

      Plaintiff Katrinna S. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decisions denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings and oral

arguments, and the applicable law, I cannot find that substantial evidence supports the

Commissioner's denial of benefits. Accordingly, I recommend that the decision be reversed and

the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

      The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

1

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Katrinna applied for DIB in May 2014, Administrative Record ("R.") 234–37, and for SSI in June 2014, R. 238–43, alleging disability because of complex regional pain syndrome, chronic fatigue, migraine headaches, chronic pain, and anxiety, R. 268. She was nineteen years old, or a "younger person" under the regulations, when she filed her claims. *See* R. 116, 1267; 20 C.F.R. §§ 404.1563(c), 416.963(c). Katrinna alleged that she became disabled on July 16, 2010. R. 234. Disability Determination Services ("DDS"), the state agency, denied her claims initially in August 2014, R. 114–39, and upon reconsideration in February 2015, R. 140–67. In May 2016, Katrinna testified at an administrative hearing before ALJ Brian Rippel. *See* R. 76–113. ALJ Rippel issued an unfavorable decision in June 2016, R. 56–70, which the Appeals Council declined to review, R. 1–7.

Katrinna timely filed an action in this Court contesting ALJ Rippel's decision. *See* R. 1346–47. In February 2019, the undersigned recommended that the decision be remanded under sentence six of 42 U.S.C. § 405(g), based on the Appeal Council's erroneous refusal to consider new and material evidence that Katrinna submitted to the agency after the ALJ's decision. *See* R.

1348–64. Later that month, the Honorable Michael F. Urbanski adopted my report and

recommendation in its entirety and remanded Katrinna's claims to the SSA under sentence six.

In August 2019, the Appeals Council vacated ALJ Rippel's prior decision and remanded

Katrinna's claims for ALJ Rippel to issue a new decision based on all the evidence in the record.

R. 1367–69. In March 2021, Katrinna appeared with counsel and testified at a second

administrative hearing before ALJ Rippel. *See* R. 1290–1315. A vocational expert ("VE") also

testified at the hearing. *See* R. 1307–14.

ALJ Rippel issued an unfavorable decision on March 25, 2021. *See* R. 1267–82. He

found that Katrinna had not engaged in substantial gainful activity since July 16, 2010, her

alleged onset date, and that she met the Act's insured-status requirements through December 31,

2015, R. 1270.[3] Katrinna suffered from "severe" medically determinable impairments ("MDI")

of "anxiety disorder, asthma, attention deficit hyperactivity disorder (ADHD), bilateral carpal

tunnel syndrome (CTS), depressive disorder (including major depressive disorder), bipolar

disorder, lower extremity chronic regional pain syndrome (CRPS), chronic fatigue, fibromyalgia,

hip arthralgias, panic disorder, posttraumatic stress disorder (PTSD), idiopathic hypersomnia,

neuropathy, migraine headaches, right shoulder arthralgia, and spine impairment (scoliosis)." *Id.*

Katrinna also had "nonsevere" MDI of cystic acne, history of orthostatic hypertension, syncope,

irritable bowel syndrome ("IBS"), and gastroesophageal reflux disease ("GERD"). *Id.* None of

---

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699
F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Katrinna] must prove that she became disabled prior
to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56. Her DLI is not relevant to the SSI
claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20
C.F.R. §§ 416.202, 416.501. Because SSI benefits cannot be paid for any period before the month in
which the claimant protectively filed her SSI claim, however, the earliest date on which Katrinna could
establish "disability" for SSI purposes is May 31, 2014. *See* R. 1267, 1282; 20 C.F.R. §§ 416.202,
416.501.

Katrinna's "severe" impairments met or medically equaled a relevant Listing. R. 1270–74 (citing

20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 3.03, 11.02, 11.14, 12.04, 12.06, 12.11).

ALJ Rippel then evaluated Katrinna's residual functional capacity ("RFC") and found

that she could perform "sedentary"[4] work except:

> she is limited to only occasional pushing and/or pulling (including foot control operations) with the bilateral lower extremities; needs the flexibility to alternate between sitting and standing while at the work station and on-task [sic]; only occasional climbing ramps or stairs, balancing, stooping, or crouching; no kneeling, crawling or climbing ladders, ropes, or scaffolds; only occasional overhead reaching with the bilateral upper extremities; only frequent handling or fingering with the bilateral upper extremities; only occasional exposure to cold or heat extremes, wetness, humidity, loud noise . . . vibration, respiratory irritants (such as fumes, odors, dust, gases, poorly ventilated areas); there must be no exposure to workplace hazards (including unprotected heights and dangerous machinery); limited to routine tasks in entry-level, unskilled work, with instructions that are not involved; while the individual can sustain concentration and persistence for 2-hour segments, the job must include routine, customary breaks after about 2-hour periods of work; no fast-paced production rate (defined as a setting in which a rapid pace of work is set by a conveyor belt or other similar external source, as well as rapid assembly line work where co-workers are side-by-side and the work of one affects the work of the other); limited to low-stress work (defined as involving only occasional independent decision making and/or change in the work setting); and, requiring only occasional interaction with the public, co-workers, and/or supervisors.

R. 1274–75 (cleaned up). Katrinna did not have any past relevant work, but, based on this RFC

finding and the VE's testimony, ALJ Rippel found that she could perform certain unskilled

"sedentary" jobs existing in significant numbers in the national economy, including order clerk

and inspector. R. 1281 (citing R. 1308–10). Thus, he concluded that Katrinna was "not disabled"

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools," 20 C.F.R. §§ 404.1567(a), 416.967(a), and generally requires sitting for about six hours, and standing/walking for about two hours, during an eight-hour workday, *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002). *See* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). Younger "[i]ndividuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," SSR 96-9p, 1996 WL 374185, at *3, but they are not presumed disabled unless they also are "illiterate or unable to communicate in English," *see* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.00, 201.17–201.29. ALJ Rippel found that Katrinna could perform the physical demands of sedentary work, R. 1274, and had "at least a high school education," R. 1281.

at any time from July 16, 2010, through March 30, 2021. R. 1282. The Appeals Council declined

to review that decision, and this appeal followed. *See Alicia W. v. Saul*, No. 5:20cv6, 2021 WL

2366108, at \*2 (W.D. Va. June 9, 2021) ("'If no exceptions are filed and the Appeals Council

does not assume jurisdiction' on its own within the sixty-day period, the ALJ's hearing decision

automatically 'becomes the final decision of the Commissioner after remand.'" (quoting 20

C.F.R. §§ 404.984(d), 416.1484(d))).

## III. Discussion

Katrinna raises several challenges relating to the ALJ's RFC finding that she could

perform a limited range of "sedentary" work for eight hours a day, five days a week in a

competitive work environment. *See generally* Pl.'s Br. 11–31, ECF No. 14-1. First, she argues

that ALJ Rippel erred by failing to properly evaluate the medical opinions of her treating

providers, Debra Hearington, N.P., and Ronald Schubert, M.D., particularly NP Hearington's

opinions that Katrinna must elevate her legs during the day to control edema and severe pain. *Id.*

at 11–19. Katrinna further contends that ALJ Rippel's RFC finding is not supported by

substantial evidence because he decided her RFC first, and then credited only the evidence he

believed supported that result. *Id.* at 19–23 (citing *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d

377, 387 (4th Cir. 2021)). Lastly, she asserts that the ALJ erroneously rejected her subjective

allegations of pain. *Id.* at 23–27. Katrinna's first argument is persuasive.

*A.    Summary*

*1.    Relevant Medical Evidence*

As early as January 2010, at age fifteen, Katrinna treated with her pediatrician for lower

back pain, fatigue, and abdominal pain. R. 330. She returned to her pediatrician regularly with

similar and worsening conditions and symptoms over the course of almost two years. *See* R.

331–71. In July and August 2010, shortly after her AOD, she began to complain about swelling

(edema) in her left leg that seemed to be associated with pain in that hip. *See* R. 339–41. Exam

notes from later that year confirm swelling and tenderness in her left leg. *See, e.g.*, R. 339–40,

342–44, 347–48. In November 2010, Katrinna was diagnosed with lymphedema of the left leg

and referred to the University of Virginia's vascular clinic for a venogram. *See* R. 344, 347–48.

Results were inconclusive. *See* R. 348, 353.

In December 2011, Katrinna began treatment with Dr. Schubert of Dayton Family

Medicine, at which time she complained of left leg and hip pain, with associated symptoms of

abdominal pain and headaches. R. 618–25. Over the next several months, Katrinna followed up

regularly for varying complaints, mostly related to musculoskeletal pain and swelling, with

mixed findings on exams. S*ee* R. 457–89, 626–64. In April 2012, Dr. Schubert diagnosed her

with CRPS, R. 658, and she was later referred to Johns Hopkins for a neurological evaluation, R.

471. A subsequent treatment note indicates, however, that the Johns Hopkins doctors had failed

to reach a consensus on her diagnosis "so no correct treatment ha[d] been found after two years

of looking." R. 476 (summarizing treatment and referral history).

In July 2012, Katrinna began treatment with NP Hearington at VCU Medical Center's

Pediatric Neurology Clinic with complaints of persistent pain and swelling on the left side of her

body. R. 955. Exam findings confirmed non-pitting edema and delayed capillary refill in her left

leg and foot, as well as "mild edema" in her right hand, but were otherwise normal. R. 958. A

treatment note indicates that Katrinna "had been homebound for schooling due to medical needs"

before her eighteenth birthday. R. 916 (Sept. 2012). Over the next three years, Katrinna

continued to treat regularly with NP Hearington, Dr. Schubert, and other providers connected to

Dayton Family Medicine and VCU Medical Center. *See generally* R. 865–69, 819–23, 571–73,

779–84, 388–91, 757–63, 418–21, 425–29, 1019–25, 1120–24, 1557–58. Imaging of her hips

taken around this time was normal, R. 929, 936, but a rheumatologist at VCU Medical Center

noted that this result was "not abnormal in" patients with CRPS, R. 929. Physical exam findings

were mostly normal, but Katrinna was frequently noted to have lower extremity edema and

musculoskeletal tenderness. *See, e.g.*, R. 498–99 (Sept. 2012); R. 760–61 (Jan. 2014); R. 881

(Oct. 2014); R. 867–68 (Dec. 2012); R. 916–17 (Sept. 2012); R. 1002 (Nov. 2014); R. 1728 (Jan.

2015). Her treatment consisted mostly of medication, and she was advised that symptom control

was all that could be offered because "[t]here are no solutions [t]o her pain." R. 419; *see also* R.

499 (indicating that her pain medication was "not to completely take away pain but rather to

prevent suffering").

      2.    *Opinion Evidence*

     In March 2015, Dr. Schubert completed an RFC Questionnaire regarding Katrinna's

functional capabilities. *See* R. 1112–14. Dr. Schubert had treated Katrinna at "monthly visits" for

the past four years, diagnosed her with CRPS, chronic pain, and chronic fatigue, and noted that

her prognosis was "guarded." R. 1112. He said Katrinna exhibited "swelling of the left lower

extremity" with "diffuse muscle tenderness" and "trigger points," suffered from "constant leg

and hip pain increased with range of motion," her impairments had lasted or could be expected to

last at least twelve months, and Katrinna was not a malingerer. *Id.*; *see* R. 1113 (opining that

Katrinna's medical impairments were "reasonably consistent with the symptoms and functional

limitations described in this [RFC] evaluation" (emphasis omitted)). He opined that Katrinna

would "constantly" experience pain or other symptoms severe enough to interfere with the

concentration and attention needed to perform simple tasks and "her pain will cause fatigue and

distractions," making her capable of performing only "low-stress work." R. 1113. Katrinna could

walk zero city blocks without rest or severe pain; could sit for forty-five minutes at a time, and fewer than two hours total in an eight-hour workday; and could stand for twenty minutes at a time, and stand/walk for fewer than two hours total in an eight-hour workday. *Id.* She could never climb ladders; could rarely twist, stoop, and crouch/squat; and could occasionally climb stairs. R. 1114. Katrinna could grasp, turn, or twist objects with both hands for 10% of the workday, perform fine manipulation with her right and left fingers 10% of the workday, and reach for 10% of the workday with each arm. *Id.* He opined that Katrinna's impairments were likely to produce "good days" and "bad days" and she would likely miss more than four days of work per month because of her impairments or treatment. *Id.* Dr. Schubert was not asked if Katrinna would need to elevate her legs with prolonged sitting. *See* R. 1112–14.

In July 2015, NP Hearington completed a similar RFC Questionnaire regarding Katrinna's limitations from her impairments. R. 1213–16. She diagnosed CRPS and noted symptoms of "left hip & leg pain, bilateral leg swelling, pain in right arm & wrist, extreme fatigue, headaches, intermittent dizziness, [and] recent onset of loss of strength in right hand." R. 1213 ("Primary pain site is left hip. Pain will spread down leg & across buttocks. Pain is searing & aching, worsening with activity"). Her prognosis was "fair [to] good – depending on symptom control." *Id.* (noting treatment included increased "fluids, rest, high dose Lyrica & opioid management for pain, [and] stimulant medication for fatigue"). NP Hearington opined that Katrinna could occasionally carry ten pounds or less, could never carry more than ten pounds, would need a job that permitted shifting positions at will, would need to walk around for about ten minutes every ninety minutes during the workday, and would need unscheduled breaks every ninety minutes for about fifteen minutes throughout the workday. R. 1214; *see also* R. 1215 ("Her pain & leg swelling significantly affect her functional ability during flare-ups, which are

frequent."). She could walk about one city block without needing to rest or experiencing severe

pain, could sit "intermittent[ly]" for about four hours during an eight-hour workday, but she

could sit for only fifteen minutes at one time before changing position because "sustained sitting

is difficult for her." R. 1215. She could stand and/or walk "intermittent[ly]" for about two hours

total in an eight-hour workday, but she could stand for only fifteen minutes at one time because

"she needs frequent position changes." *Id.* She further opined that Katrinna could rarely twist,

crouch, or climb ladders and stairs, she could occasionally stoop or bend, and she would have

"good days" and "bad days" from her impairments. R. 1216. Finally, NP Hearington indicated

that, with "prolonged sitting," Katrinna's legs should be elevated to hip level for ten percent of

an eight-hour workday. R. 1214. She noted that Katrinna's symptoms and limitations dated back

to July 2012, the same month NP Hearington started seeing her in VCU's pediatric neurology

clinic. R. 1213, 1216.

Also in July 2015, NP Hearington wrote a "To Whom It May Concern" statement on

Katrinna's behalf. R. 1212 ("Child Neurology Correspondence *Final Report*"). In the report,

NP Hearington wrote that Katrinna suffered from CRPS and migraines, and she said Katrinna's

CRPS was associated with "swelling of both legs and feet." *Id.* She offered the following

assessment:

> Limitations in work environment include, but not limited to, single floor with few
> steps to negotiate, ability to change positions frequently and prop up legs as
> needed, and no perfumes, chemical odors or other fumes or gasses that would
> trigger migraine headaches. Katrinna's health condition has periods of stability
> and periods of flare-ups that are unpredictable. Thus, she needs a work
> environment that would accommodate her limitations 100% of the time.

*Id.*

In September 2016, NP Hearington authored another "Child Neurology Correspondence"

detailing Katrinna's history of medical impairments, treatment, and related functional

limitations. *See* R. 1540–42. She described that Katrinna had suffered from CRPS since 2012 and had a history of migraines. R. 1540. NP Hearington cited abnormal signs on neurological exams during her treatment of Katrinna, including edema in the legs and feet, abnormal reflexes, and pain over trigger points in the back, as evidence supporting her opinions. R. 1541 (citing R. 958 (edema in left leg & foot, "mild" edema in right hand, right fundus with blurred vessel, margins & background, unable to visualize disk, 1+ DTRs in upper extremities, 3+ patellar and 2+ ankle reflexes) (July 12, 2012); R. 916–17 ("slight" edema in left leg & foot, left extremity cooler than right) (Sept. 6, 2012); R. 867–68 ("slight" edema in feet) (Dec. 5, 2012); R. 781–82 ("slight" edema in both feet, DTRs 2+ in upper extremities and left patellar and 3+ in right patellar) (Oct. 17, 2013); R. 1065–66 (tenderness at trigger points over scapula bilaterally, DTRs 2+ symmetrical) (July 29, 2014); R. 1043–44 (tenderness at trigger points over scapula bilaterally persisting from July 2014 visit, DTRs 1+ symmetrical) (Sept. 19, 2014)). NP Hearing "regularly consulted" with Jean Teasley, M.D., and other pediatric neurologists while managing Katrinna's care. R. 1540.

Katrinna's CRPS was treated with Lyrica and her migraines were "controlled with metoprolol." R. 1541. Even with treatment, Katrinna "continue[d] to have intermittent pain [and] swelling in her legs," edema in her lower legs made them cold to touch, and she had "limitation of motion in the left leg during [CRPS] flare-ups [and] her limitations [were] magnified when she [could not] elevate that leg during the day as needed." *Id.* NP Hearington explained that she routinely "instructed [Katrinna] in visits & by phone calls to ensure that she elevates that leg several times during the day." *Id.* Katrinna's medical records did not contain those express instructions, however, because elevation is "a common sense" and widely known way to reduce swelling and related pain in the limbs. *Id.* ("It is commonly known that swelling is worsened by

gravity such that when a person is standing with arms to the side, swelling will be worsened in the body parts lower than the heart which is known as dependent edema."). Elevation also "had been beneficial to [Katrinna] by her own report," *id.*, indicating that she was following those instructions, *see id.* ("[She] has followed all recommendations given to her."). As to Katrinna's "functional limitations, particularly sitting in a chair vs. sitting in a recliner," NP Hearington explained that "sitting in a [regular] chair increases edema [because] the femoral vessels are flexed [when] the legs are flexed at the hips, allowing for increase in swelling in the feet (dependent edema)." R. 1541. "Sitting in a recliner," on the other hand, "allows the femoral vessels & the leg/hip to remain extended facilitating fluid return to the kidneys to be excreted" from the body. *Id.* "This should reduce the amount of swelling in the leg." *Id.* NP Hearington also noted that Katrinna experienced swelling in her left arm and hand, which caused her to drop things with her right hand, and she said the swelling reduced Katrinna's manual dexterity making it difficult to write. *Id.* NP Hearington wrote that Katrinna's condition was likely to be long-term, and she noted that Katrinna had flare-ups of CRPS with extensive swelling in her legs, primarily on the left. *Id.* She opined that Katrinna would be unable to meet the requirements of sedentary work because of the unpredictability of these flare ups and her decreased functional capacity resulting from her conditions. *Id.* NP Hearington also noted that Katrinna was unable to perform her past work because of increased, unpredictable, and intermittent swelling and worsening fatigue. *Id.* On October 26, 2016, Dr. Teasley "reviewed and agreed" with NP Hearington's Correspondence. *See* R. 1540.

    *3.*    *Katrinna's Statements*

    In May 2016, Katrinna testified at an administrative hearing before ALJ Rippel. *See* R. 1481–1518. She said her CRPS caused a constant, severe pain in her left hip that made her

unable to stand, walk, or sit for long periods. R. 1489. The severity of her CRPS would vary, and

for at least seven days out of every month, her pain was so severe that she would not want to get

up from her recliner. R. 1489–90. She would prop her legs up to alleviate the pain, even on her

better days, and she always raised her feet to at least hip level when sitting. R. 1490. Katrinna

could walk "maybe" twenty minutes before experiencing severe pain or risking falling, and she

could stand for "maybe" twenty minutes at a time. R. 1500. If she did not elevate her legs,

Katrinna could sit for a maximum of thirty minutes before her pain became so severe that she

either had to stand up or was unable to function. *Id.* At most, Katrinna would go "maybe" forty

minutes at a time without having her legs elevated. R. 1501.

Katrinna again testified at an administrative hearing before ALJ Rippel in March 2021.

*See* R. 1290–1315. Katrinna reiterated that her CRPS caused pain and swelling in her left hip that

were reduced when she elevated her legs. R. 1297. Her hip problems combined with her

medications caused falls, R. 1300–01, and she would fall once or twice a week, R. 1301. She

could walk for "[m]aybe ten minutes, if that" at a time, and could stand for about ten minutes at a

time. R, 1303. When she sat, she usually elevated her legs, and she said that she was "not

supposed to sit at all with my legs down. They're supposed to be elevated." *Id.* Katrinna also

described experiencing numbness in her hands that caused difficulty handling. R. 1305.

B.    *Analysis*

Katrinna challenges the ALJ's RFC finding. A claimant's RFC is her "maximum

remaining ability to do sustained work activities in an ordinary work setting" for eight hours a

day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL

374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based

on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–

31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). As relevant here, ALJ Rippel found that, notwithstanding Katrinna's severe CRPS and other impairments, she still could have sustained full-time work in a job that accommodated the following restrictions:

> lifting and/or carrying up to 10 pounds occasionally and less than ten pounds frequently; standing and/or walking up to 2 hours and sitting up to 6 hours in an 8-hour workday . . . ; needs the flexibility to alternate between sitting and standing while [staying] at the work station and on-task; . . . limited to routine tasks in entry-level unskilled work with instructions that are not involved; while the individual can sustain concentration and persistence for 2-hour segments, the job must include routine, customary breaks after about 2-hour periods of work; . . . limited to low-stress work (defined as involving only occasional independent decision making and/or change in the work setting). . . .

R. 1274–75. ALJ Rippel did not include any restrictions that would allow Katrinna to rest and elevate her legs as needed throughout the workday, to be off task during "2-hour periods of work" if she was fatigued or distracted by pain, or to walk around other than during her "customary breaks" every two hours or so, R. 1274. *See* R. 1113–14 (Dr. Schubert); R. 1214–16 (NP Hearington); R. 1540–41 (Dr. Teasley/NP Hearington).

*

In determining a claimant's RFC, the ALJ must consider all "medical opinions" of record. For claims filed before March 27, 2017, medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1),

14

416.927(a)(1). The ALJ must adequately explain the weight afforded to each medical opinion in the claimant's record, taking into account relevant factors such as the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the physician's area of specialty. *Id.* §§ 404.1527(c), 416.927(c).

Under the "treating physician rule," opinions from physicians who, by virtue of an established "treatment relationship" with the claimant, are "likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's impairments, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Thus, a treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give a treating physician's medical opinion controlling weight, then he must consider the five regulatory factors "to determine what lesser weight should instead be accorded the opinion." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 256 (4th Cir. 2017). The ALJ "will always give good reasons" for the weight assigned to these opinions. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Although treating physicians' medical opinions deserve deference, the ALJ may discount or reject such an opinion when he relies on "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014); *Hines*, 453 F.3d at 563 n.2. A reviewing court "must defer to the ALJ's assignments of weight" among differing medical opinions unless his underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir.

15

2016).

ALJ Rippel's evaluation of NP Hearington's opinions, one of which Dr. Teasley

endorsed as her own,[5] does not meet this deferential standard of review. NP Hearington opined

in her July 2015 RFC Questionnaire that Katrinna needed to walk around for ten minutes every

ninety minutes during the workday, needed an unscheduled break for fifteen minutes every

ninety minutes, and needed to elevate her legs at hip level for ten percent of the workday if

performing sedentary work. R. 1214. She also found that Katrinna could occasionally carry ten

pounds or less, never carry more than ten pounds, sit and stand for fifteen minutes each at a time,

sit for four hours total, and stand for two hours total in an eight-hour workday, and she could

walk only one city block before experiencing severe pain or needing to rest. R. 125. That same

month, in her "To Whom It May Concern" statement, NP Hearington reiterated that Katrinna

should "change positions frequently and prop up [her] legs as needed" while sitting. R. 1212. NP

Hearington additionally noted that Katrinna should be limited to a single floor with few steps to

negotiate and her condition had periods of stability and flare-ups that were unpredictable. *Id.* In

her September 2016 Correspondence, NP Hearington explained that Katrinna experienced flare

ups in her CRPS that would cause her symptoms to be magnified if she were not able to elevate

her legs as needed, and she said that sitting in a recliner would be preferred to a chair for

---

[5] Where a licensed physician adopts the opinions made by a non-acceptable medical source, such as a
nurse practitioner, the opinions of the non-acceptable source become those of the doctor. *See Palmer v.
Colvin*, No. 5:13cv126, 2014 WL 1056767, at *2 (E.D.N.C. Mar. 17, 2014) ("[I]f the facts of treatment
show the primary caregiver is a non-acceptable medical source, such as a nurse practitioner, and a doctor
adopts the findings and information about the patient and is engaged in the treatment, the nurse
practitioner's evaluation *becomes* the report of the doctor."); *cf. Russell v. Colvin*, No. 5:14cv45, 2015
WL 4484891, at *6–7 (W.D. Va. July 22, 2015) (explaining, in the context of determining which standard
to apply to a medical-source opinion signed by both a physician and his physician's assistant, that a
doctor who never examined the claimant was a treating physician "[c]onsidering the nature of the
working relationship between [the] physician and his physician assistant," who treated the claimant more
regularly, "and [the doctor's] documented review of [the claimant]'s treatment notes over an extensive
period"). Thus, because Dr. Teasley—an "acceptable medical source"—endorsed NP Hearington's
Correspondence and treated Katrinna throughout the relevant period, the opinion is entitled to deference
under the "treating physician rule."

Katrinna because a recliner would help reduce swelling in her legs. R. 1541. NP Hearington also

noted that Katrinna experienced swelling in her left arm and hand that caused her to drop things

and made it difficult to write, Katrinna's condition was likely to be long-term, and the

unpredictability of her flare ups would preclude Katrinna from performing sedentary work on a

regular and continuing basis. *Id.*

In October 2016, Dr. Teasley endorsed NP Hearington's Correspondence as her own

opinion, *see* R. 1540–42, entitling that opinion to deference under the "treating physician rule,"

*see Palmer*, 2014 WL 1056767, at *2; *cf. Dowling*, 986 F.3d at 386 ("Had the ALJ properly

considered the treatment relationship between Dr. Goss and Appellant, he may not have been so

quick to reject Dr. Goss's medical opinion."); *Brown*, 873 F.3d at 271 (finding ALJ erred by

failing to "acknowledge and assess" the opinion of a treating physician under the proper legal

standard). Thus, because ALJ Rippel did not assign "controlling weight" to NP Hearington's

September 2016 Correspondence, he was required to consider the factors in 20 C.F.R. §§

404.1527(c), 416.927(c). *See Dowling*, 986 F.3d at 384–85. In considering those factors, the ALJ

need not provide a "detailed factor-by-factor" analysis, but it must nonetheless "be apparent from

the ALJ's decision that he meaningfully considered *each* of the factors before deciding how

much weight to give the opinion." *Id.* Here, it is not clear that ALJ Rippel considered these

factors in assessing NP Hearington's September 2016 Correspondence.

The ALJ relied on findings of only "slight" lower extremity edema and normal gait, as

well as Katrinna's improvement in CRPS and positive response to pain medications, as reasons

why NP Hearington's September 2016 Correspondence deserved only "little weight." R. 1280.

These findings concern the "consistency" of NP Hearington's opinion with other relevant

evidence of record. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Consistency is among one

17

of the factors to be considered when evaluating medical opinions. *Id.* Any indication of how, or

if, ALJ Rippel considered the remaining factors set forth in 20 C.F.R. §§ 404.1527(c)(2)(i)–(6),

416.927(c)(2)(i)–(6), however, is absent from his decision.

Several of the factors not considered by the ALJ, however, appear to weigh in Katrinna's

favor. *See Dowling*, 986 F.3d at 386 ("This error necessitates a remand in this case. Two of the

factors ignored by the ALJ . . . appear to cut in Appellant's favor."). For instance, ALJ Rippel

never considered the "treatment relationship" Katrinna had with NP Hearington and Dr. Teasley.

*See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In her Correspondence, NP Hearington wrote

that she had treated Katrinna since 2012, R. 1540, which the record confirms, *see* R. 955. It

appears Dr. Teasley likewise began treating Katrinna for her migraines and CRPS in 2012. *See

id.* Moreover, these providers treated Katrinna on a relatively consistent basis over the course of

several years. *See, e.g.*, R. 865, 819, 779, 757, 714, 690, 1063, 1019. Under the regulations, these

considerations suggest that NP Hearington's September 2016 Correspondence deserved greater

weight. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating

source has treated you and the more times you have been seen by a treating source, the more

weight we will give to the source's opinion."). ALJ Rippel, however, never considered this

factor. R. 1279–80; *see also Triplett v. Saul*, 860 F. App'x 855, 864 (4th Cir. 2021) ("[T]he ALJ

failed to explain whether she considered either the length or the nature of the treating

relationship, as she was required to do under § 404.1527(c), before discounting Dr. Gray's

opinion. And her analysis failed to even acknowledge the other three § 404.1527(c) factors.").

ALJ Rippel's failure to consider the treatment relationship is particularly concerning here

considering this Court's prior remand order. In that Order, the Court found that NP Hearington's

Correspondence was "new and material" evidence in part because it refuted several of ALJ

Rippel's initial reasons (in his June 2016 decision) for rejecting NP Hearington's July 2015 RFC

Questionnaire. R. 1356–63. As relevant here, ALJ Rippel previously found that because NP

Hearington was a nurse practitioner, she was not qualified to opine on Katrinna's symptoms and

limitations. *Id.*; *see also* R. 68 ("Ms. Hearington is not considered an acceptable medical source

as defined by 20 CFR 404.1513 and 416.913."). That conclusion was subject to change,

however, because "Dr. Teasely's involvement in Katrinna['s] care and endorsement of NP

Hearington's opinion might have bolstered [NP Hearington's earlier] findings in the eyes of the

ALJ and therefore caused him to assign them greater weight." R. 1362; *see* R. 1359–60. Despite

this discussion, ALJ Rippel merely noted that NP Hearington's opinions were accompanied by

"an addendum from Dr. Jean Teasley in October 2016." R. 1279. He did not acknowledge that

NP Hearington's findings were "reviewed and agreed to" by Dr. Teasley, nor did he consider

how such an endorsement affected the weight he assigned to NP Hearington's September 2016

Correspondence. *Cf. Brown*, 873 F.3d at 271–72; *Dowling*, 986 F.3d at 386; *Triplett*, 860 F.

App'x at 864.

Likewise, ALJ Rippel did not consider the "supportability" of NP Hearington's

September 2016 Correspondence. Under the regulations, "[t]he more a medical source presents

relevant evidence to support a medical opinion," the more weight that opinion will be assigned,

and "[t]he better an explanation a source provides for a medical opinion, the more weight [the

ALJ] will give that medical opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Here, NP

Hearington identified the evidence upon which her conclusions were based. Specifically, she

cited to exam findings of lower extremity edema and coolness in Katrinna's feet, R. 1541 (citing

R. 958, 916–17, 867–68), and abnormal reflexes and pain over trigger points, *id.* (citing R. 958,

781–82, 1065–66, 1043–44). NP Hearington also provided explanations as to how she reached

19

her conclusions. *See* R. 1540–41 ("Allowing for reduction of the influence of gravity, such as would occur when elevating the body part, should help reduce swelling in the absence of other pathological reasons for swelling."); R. 1541 (explaining that "sitting in a chair increases edema as the femoral vessels are flexed as the legs are flexed at the hips, allowing for an increase in swelling in the feet"). ALJ Rippel, however, did not consider the impact of the evidence cited by NP Hearington on the supportability of her opinion or whether NP Hearington's explanations warranted affording her opinions greater weight.

Thus, several factors appear to weigh in favor of affording NP Hearington's September 2016 Correspondence greater weight than ALJ Rippel did in this case. Nonetheless, ALJ Rippel did not consider these factors in assigning her opinion "little weight." His rationale focused on his finding that NP Hearington's opinions were at odds with exam findings demonstrating only "slight" edema and consistently normal gait. R. 1280. NP Hearington, however, relied on evidence of exams showing "slight" edema and normal gait in formulating her September 2016 Correspondence, including her finding that Katrinna needed to elevate her legs throughout the day. *See* R. 1541 (citing R. 916–17 ("slight" edema, normal gait); R. 867–68 (same); R. 781–82 (same)). Thus, it appears that NP Hearington found that the "slight" edema Katrinna exhibited at several points throughout the relevant period, combined with findings of coolness in her feet, abnormal reflexes, and pain at trigger points, caused Katrinna the limitations outlined in her opinions and made it necessary for her to elevate her legs as needed during the workday, notwithstanding her consistently normal gait. *See* R. 1540–42. Moreover, in recommending remand, the undersigned recognized that NP Hearington's opinions regarding Katrinna's need to elevate her legs were not undermined by findings of normal gait. R. 1361 ("Though the ALJ correctly noted that NP Hearington's exams often showed normal strength, gait, or range of

motion, these findings did not undermine NP Hearington's conclusion that Katrinna []
experienced bilateral leg swelling and would need to keep her legs elevated for some portion of
the workday.") (record citations omitted). As such, the ALJ's finding that NP Hearington's
opinions were inconsistent with exam findings of "slight" edema and normal gait is not
supported by substantial evidence.

ALJ Rippel also cited Katrinna's improvement in her CRPS and her positive response to
medication as reasons for rejecting NP Hearington's opinions. R. 1280. Katrinna's CRPS was
noted to be improving a few times throughout the record. *See* R. 522 ("Over the past 2 years, she
has had some general improvement.") (Jan. 2013); R. 602 ("Her regional pain syndrome has
actually improved over the past 2 years . . . .") (Sept. 2013); R. 609 ("She has a history of
complex regional pain syndrome. This is slowly getting better.") (Nov. 2013); R. 1067
("Katrinna has improvement & looks better than at previous visits.") (July 2014). The extent of
Katrinna's improvement, however, appears rather limited. For instance, although treatment
records note "general" improvement in Katrinna's CRPS in January 2013, she continued to
report severe pain, and at least "slight" lower extremity edema often continued to be present on
exams after that time. *See, e.g.*, R. 819–22 ("Katrinna is still having the same amount of pain she
always ha[d]," and exam revealing "slight" edema in both feet and feet cooler than legs and
upper extremities) (Mar. 2013); R. 616 ("She continues to have regional pain in her left lower
extremity and her left lower extremity remains cooler than usual and turns purple.") (Dec. 2013);
R. 761 (exam revealing "slight" edema in both ankles and feet, left greater than right, which was
"consistent with previous visits") (Jan. 2014); R. 426–28 (noting a recent "severe exacerbation of
her left lower extremity swelling," and exam revealing "slight" edema of left lower extremity to
the mid tibia, foot and ankle slightly cooler on the left than right, tenderness on palpation) (Apr.

21

2014); R. 437 ("Her pain from [CRPS] continues to be substantial.") (May 2014); R. 443–45

(noting increased swelling with warmer temperatures, and exam revealing "slight" peripheral

edema worse on the left and a "minimal" temperature change between the lower extremities)

(June 2014); R. 1125 (noting "new symptoms of radiculopathy" from CRPS) (Apr. 2015).

Nonetheless, ALJ Rippel only mentioned Katrinna's "general" improvement without considering

the rather limited nature of that improvement. *Cf. Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir.

2018) ("An ALJ may not consider the *type* of activities a claimant can perform without also

considering the *extent* to which she can perform them."); *Lewis*, 858 F.3d at 869 ("An ALJ has

the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that

support a finding of nondisability while ignoring evidence that points to a disability finding."

(quotation marks omitted)). He did not explain why Katrinna's "general" improvement in her

CRPS conflicts with NP Hearington's ongoing abnormal findings. *Cf. Brown*, 873 F.3d at 263

(reversing and remanding in part because "the ALJ provided no explanation as to how those

[daily] activities . . . showed that he could persist through an eight-hour workday" five days per

week).

      The ALJ's reliance on Katrinna's positive response to pain medications suffers from

similar flaws. First, as with the findings of "slight" edema, it appears that NP Hearington

considered Katrinna's response to medications within the September 2016 Correspondence, but

nonetheless determined that Katrinna would still require the limitations outlined in her opinions.

*See* R. 1541 ("She has, over time, slowly been able to taper her pain medications & has followed

all recommendations given to her."). Additionally, despite some reports that certain medications

"helped," *see* R. 758, 627, the extent of this positive response was likewise limited. For instance,

in December 2011, Katrinna said Cymbalta only "modestly" improved her symptoms, and her

provider noted that Katrinna had "not responded to any other medications." R. 627. Although

Katrinna said in January 2014 that Percocet helped manage her chronic pain, she also reported

increased hip pain at that time. R. 758. Indeed, in June 2014, Katrinna's medical provider noted

that "[p]ain control [was] an issue," and her team of physicians had "no viable suggestions to

date that ha[d] not been tried." R. 443. Nevertheless, the ALJ did not discuss the evidence

demonstrating the limited extent of Katrinna's positive response to medication, and he did not

explain how her positive response to treatment—to this limited extent—was at odds with NP

Hearington's findings.

Moreover, NP Hearington primarily based her opinions on the unpredictable nature of

Katrinna's flare ups from CRPS. *See* R. 1212 ("Katrinna's health condition has periods of

stability and periods of flare-ups that are unpredictable."); R. 1541 ("The flare-ups of CRPS are

unpredictable & when she does have a flare-up, she has extensive swelling in her legs with the

left leg primarily being affected."). The record demonstrates that Katrinna's lower extremity

swelling was often noted as being "intermittent" or "episodic." *See* R. 649 ("Her hip pain is the

same, it is episodic and severe."); R. 881 (noting "intermittent" left leg/hip pain and swelling).

Indeed, both NP Hearington and Dr. Schubert opined that Katrinna would likely experience

"good days" and "bad days" from her impairments, R. 1114, 1216, and Katrinna herself testified

to the same, R. 1489–90. Thus, that Katrinna went through some periods of improvement and

responded positively to medication at certain times during the relevant period does not

necessarily conflict with NP Hearington's finding that unpredictable flare ups in Katrinna's

condition would still create the need for the limitations set forth in her opinions, including the

need to elevate her legs during the workday. Aside from noting that the record demonstrated

improvement in Katrinna's CRPS and that she had a positive response to medication, however,

ALJ Rippel provided no explanation for how that evidence informed his conclusion that NP Hearington's opinions only warranted "little weight." Indeed, nowhere in the ALJ's decision did he offer a valid rationale for his finding that Katrinna could persist through an eight-hour workday for five days a week without having to elevate her legs. As such, ALJ Rippel failed to provide an "accurate and logical bridge" from the evidence to his conclusion as to Katrinna's RFC. *Woods*, 888 F.3d at 694. Accordingly, remand is warranted.[6]

**

Katrinna argues that remand with an instruction to award benefits is appropriate in her case. *See* Pl.'s Br. 27–29. Specifically, Katrinna notes that one ALJ has already failed to comply with this Court's directives, the relevant period for her DIB claim is becoming "increasingly remote," the case has had two hearings and two decisions over seven years, and the "uncontradicted" evidence supports finding her disabled. Pl.'s Br. 27. Thus, she argues that remanding her claims for further adjudication would serve "no useful purpose." *Id.* at 28 (quoting *Arakas v. Comm'r of Soc. Sec.*, 888 F.3d 83, 111 (4th Cir. 2020)).

The Court previously remanded this case, without passing judgment on the merits of ALJ Rippel's prior decision to deny benefits, under the sixth sentence of 42 U.S.C. § 405(g), so the Commissioner could have the first opportunity to consider "new and material evidence" on

---

[6] Katrinna additionally argues that ALJ Rippel's assessment of NP Hearington's opinion was deficient because he failed to explicitly consider many of her findings, including the whole of the July 2015 "To Whom It May Concern Letter." Pl.'s Br. 14–15. Although the Commissioner contends these findings were accounted for in the ALJ's summary of NP Hearington's opinions, or in his RFC finding, this assertion does not appear accurate. Def.'s Br. 12, ECF No. 22. For instance, NP Hearington wrote in the letter that Katrinna could not be exposed to "perfumes, chemical odors, or other fumes or gasses," R. 1212, whereas ALJ Rippel only limited Katrinna to occasional exposure to respiratory irritants, R. 1275. Additionally, although ALJ Rippel acknowledged that NP Hearington found Katrinna would need to elevate her legs to hip level ten percent of the workday, as stated in NP Hearington's RFC Questionnaire, NP Hearington's letter was more restrictive, stating that Katrinna needed to elevate her legs "as needed." R. 1212. Although NP Hearington's letter would not be entitled to treating physician deference, all of her findings should nonetheless be considered on remand. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled.").

24

Katrinna's disability claims. *See* R. 1362–63. I now recommend to reverse the Commissioner's most recent denial of benefits and remand the case under the fourth sentence of 42 U.S.C. § 405(g). That clause authorizes federal courts to enter "judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* § 405(g). The court's only role in reviewing such decisions is to determine whether the Commissioner's "findings are supported by substantial evidence" in the claimant's record "and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). "A necessary predicate to engaging" in this review "is a record of the basis for the ALJ's ruling." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). "The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Id.* "If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). There are exceptions, of course, such as cases where the claimant's otherwise fully developed "record does not contain substantial evidence to support a decision denying [benefits] under the correct legal standard," *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974), "the delay involved in repeated [federal-court] remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court," *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *17 (W.D. Va. June 24, 2014) (quoting *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 800 (E.D. Wis. 2004)). *See Radford*, 734 F.3d at 295 (citing *Breeden*, 493 F.3d at 1011–12). The district court has discretion to choose the appropriate remedy. *See id.*; *McKinney v. Colvin*, 111 F. Supp. 3d 663, 666 (E.D.N.C. 2015).

I find that directing an award of benefits is unwarranted here. While the record undoubtedly contains evidence supporting Katrinna's position that she is disabled, it does not contain "undisputed evidence" that "compels [the court] to conclude that [she] was unable to sustain full-time work—eight hours a day, five days a week—during the relevant period." *See Arakas*, 983 F.3d at 111 (footnotes omitted). Indeed, the record contains conflicting evidence regarding Katrinna's functional capabilities throughout the relevant period. *Compare* R. 123 (DDS reviewer opining that Katrinna could sit for about six hours total in an eight-hour workday), *with* R. 1215 (NP Hearington opining that Katrinna could sit for about four hours total in an eight-hour workday); R. 1113 (Dr. Schubert opining that Katrinna could sit for fewer than two hours total in an eight-hour workday). As such, remand is warranted to allow the ALJ to apply the correct legal standard in weighing conflicting evidence, in particular about Katrinna's need to elevate her legs, and in determining whether Katrinna could work eight hours a day for five days a week. Further, the prior remand in this case was pursuant to sentence six of 42 U.S.C. § 405(g) because of the Appeal Council's failure to consider new and material evidence and, thus, this is the first time the case is being reversed and remanded because of an error in the ALJ's analysis. Thus, I find that directing an award of benefits would be inappropriate based on the facts presented here. *See Marilyn P. v. Kijikazi*, No. 5:21cv29, 2022 WL 2902606, at *6–7 (W.D. Va. July 21, 2022); *cf. Felicia T. v. Saul*, No. 4:20cv33, 2021 WL 2910206, at *6 (W.D. Va. July 12, 2021) (declining to award benefits on a post-remand appeal where ALJ failed to explain material conflicts in RFC assessment, even though claim had been pending for almost nine years).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Katrinna's Motion for Summary Judgment, ECF No. 14, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 21, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 22, 2022

Joel C. Hoppe
United States Magistrate Judge

27